The first case on the calendar is Beazley Insurance versus Ace American Insurance and Illinois National Insurance. Yes. Good morning, Your Honors. Kevin Keefer. May it please the Court, on behalf of Appellant and Plaintiff Beazley Insurance Company. Again, good morning. I'm going to focus the discussion this morning on the customer issue and I'll focus the discussion of standing and perhaps the arising out of professional services issue for rebuttal, which I've reserved three minutes. You may continue. Thank you. In analyzing the question of whether the court properly granted Ace's motion for summary judgment and denied Beazley's motion for summary judgment, it seems to me that the most important thing is to understand the appropriate burden and standard that applies. In order for Ace to prevail on summary judgment, it must show, as a matter of undisputed fact in law, that there is only one interpretation of the policy at issue. The reason why is because this is an exclusion in Ace's insurance policy. Let's assume that's right and the motion had been denied. What would the trial here look like? Who are the witnesses and what are they going to say? Excellent question. In the underlying case, what will be tried is an allocation of liability with respect to Beazley's policy and Ace's policy. Ace's policy is required to provide indemnity coverage and Ace and Illinois National will also take the position that Beazley's policy responded and therefore, the question would be which policy is obligated to pay what portion of the underlying settlement. What is a jury going to hear that's going to enable it to make that determination? Fair enough. What the jury will hear is because we have a settlement as opposed to a judgment, a jury will hear what the relative fault and responsibility and the liability of the underlying CAC. I understand that, but I think the question is you are saying there should not have been summary judgment with respect to the meaning of the policy, right? If at that, you're saying there's a factual dispute about what the policy means and I think without speaking for Judge Kogan, my question would be, what will the jury hear by way of extrinsic evidence about what the policy means that would enable a trial finder of fact to reach some conclusion whether the same or different than what Judge Rakoff reached? What's the evidence on that question? Sure. Our position is that in the alternative, there's a question of fact as interpretation, but if that is how the court so concludes, the first inquiry that the trier of fact would be, did the parties intend to have a specialized legal meaning? Okay. There is a declaration submitted by the underwriter for Ace in connection with this case. In that declaration, the underwriter said in no unequivocal terms that Ace intended to use the ordinary usage of the term customer. There's an old learned hand case that says you really can't do that. You can't put in contemporaneous expressions of what was in someone's mind in order to construe a contract. If the parties exchanged emails or letters saying you understand this means this and that means that, that's admissible evidence, but to have someone take the stand and say, here's what I thought it meant at the time, that unexpressed intent isn't even admissible. Uncommunicated subjective intent. Uncommunicated subjective intent is not admissible to prove the meaning of the term. That's a different question than whether or not the parties intended a term to have a specialized legal meaning or the ordinary use. The factual question is whether or not the declarant statement is true. They intended to use the term in an ordinary sense as opposed to a legal sense. That's a factual question. That's not a state of mind. I say as a party to the contract, I intended it to mean X, but I haven't told anybody it meant X. I absolutely agree. Subjective uncommunicated intent is not evidence of intent, right? It's got to be contemporaneous. It has to be otherwise admissible evidence if the policy is ambiguous. Agreed. But that's not the factual issue. The factual issue is the predicate. The predicate under Hugo Boss is whether or not there is any express evidence that the parties did not intend to use a specialized legal meaning. Answer? Yes, there is. The underwriter for Ace himself testified in a declaration that that was not the intent, the intended ordinary use. Why isn't the question of is a customer a customer or is a customer meet the definition here? Why isn't that a question of law instead of fact? If the ultimate question of whether or not a retail investor is a customer of NASDAQ, that can be ultimately a question of law, but there are predicate facts that have to be determined first. Okay, first, did they intend to use a specialized legal meaning? That's a factual dispute. Ace's own deck underwriter said they did. Okay, two, there is a history and course of conduct between the parties. Both Ace and NASDAQ had a separate policy, a crime policy that had a definition of customer in that policy. It requires a direct contract between the purported customer and NASDAQ. Doesn't that cut both ways? Absolutely cuts both ways. And that's the question in the underlying case. That's the question below that the trier fact has to decide. So how it works is— That's the, that would be putting aside whether the declaration of the Ace underwriter qualifies as expressed intent or unexpressed intent or something else. You're saying this history of the other policy is evidence of the intended meaning that is public objective evidence. And when you say exactly that cuts both ways, you're saying that's why you need to have a trial and a fact finder decide that because you could interpret that history one way and you could interpret it a different way. Absolutely correct, Your Honor. And what I'm saying, to be absolutely clear, what I'm saying in the first instance is Ace's burden to show that Beasley's interpretation is not a reasonable interpretation. It's not whether or not Ace's interpretation in and of itself is reasonable. Multiple reasonable interpretations means Beasley wins, Ace loses. But here's where I'm trying to understand what exactly you're asking us to do. And it seems to me there are two possible levels at which you could say there's ambiguity. One is there is sufficient ambiguity given the history or given different evidence about how the legal terminology is used to require a fact finder to pass on what these parties meant it to mean. And then separately, there's an argument based on contra pro forentum that says, since this is an insurance policy, if the ambiguity rises to some level, then it could actually be decided in your favor as a matter of summary judgment. That's correct. And which level is this? Are you still arguing, are you arguing that, are you asking us in the first instance to say, actually, Judge Rakoff got it exactly backwards and there should have been summary judgment. For you, or are you only arguing there are disputed issues of fact that have to be resolved? No, I'm arguing that Judge Rakoff got it backwards, that a reasonable interpretation is the interpretation proffered by Beasley. As a result, the contra pro forentum rule applies. And in the alternative, in the alternative, if somebody was to ever look at whether or not the specialized legal intent doctrine applies, there are factual issues in dispute there that could not be resolved in summary judgment. The first factual issue is, did the intent of specialized legal mean? Second of all, even if they did, you have to look at whether there is an invariable definition. Has the issue been specifically decided? And then even if it has, all it ever gets ace is a presumption. At the end of the day, a specialized legal meaning only gets a presumption. When you have a presumption, that presumption can be rebutted by extrinsic evidence, which would have to be admissible. And here the extrinsic evidence is admissible because it's course of conduct between the same parties prior to formation of this contract, along with the accommodation plan and the other evidence. So at a bare minimum, at a bare minimum, before you could ever get the specialized legal doctrine, there are factual issues that would have to be resolved in ACE's favor and against Beasley. And at a minimum, those would have to be tried. I see that I'm over my time. So. Two minutes for rebuttal. Thank you. Three minutes. It looks like. Yes. Good morning, counsel. Good morning, your honors. May it please the court. I'm John Hacker, counsel for ACE. I'll be arguing for eight minutes, focusing on the ACE issues. And then my colleague, Mr. Lorenzo, will address the issues specific to Illinois National. Judge Poole, I think you had it exactly right. The question of who qualifies as a customer in this context is a legal question. We don't quarrel. We don't quarrel with Beasley's proposition that as a general matter, customer refers to someone who buys goods or services under the meaning of the policy. The question is what happens when you apply the policy to a particular context to answer that question? Who does a retail investor who's trading on the NASDAQ platform? Is that person a customer of NASDAQ? That can't be answered. Does, does, does that person buy something from NASDAQ? Through a broker, because as Beasley itself points out in its reply brief, a retail investor is not allowed for regulatory reasons to purchase, to go to eBay or Amazon and buy something on that platform. You can't go to the NASDAQ platform directly. You have to employ an agent to purchase stocks on your behalf, the broker. So you're the one utilizing the services as the purchasing stock from the seller of the stock. Just like as somebody using an eBay or Amazon platform is purchasing the product from say Under Armour, but they're also a customer of Amazon. Nobody would disagree with that. They're a customer of Amazon and Under Armour because there's, there's often a fee that goes with that to the, to the platform. So there are fees per transaction that are paid by the broker. Is, is, is there? Well, and passed through usually to the investors one way or the other, either on a per transaction basis. If you get your statement, it'll often say, here's the transaction fees. There's other ways brokers can set up arrangements where there's kind of a flat fee, but all that stuff is passed through one way or another. It's charged to the broker because that's the party that has the direct contractual relationship. It's charged to the broker on a per transaction basis or it's charged to the broker in the broker's membership dues or something of that kind. I, I'm not sure. I believe there are per transaction fees and there's a whole range of fees that are, you know, in this fairly complicated relationship. Doesn't that matter? I mean, if the broker is a member of the exchange and pays to have that privilege, I suppose that's part of their overhead and therefore in some way that's going to be passed along to their customers, of course. But, you know, in, in, in Citigroup against Abad for a bar, for example, we said customer has its ordinary meaning. The ordinary meaning is somebody who buys goods and services or has an account. Now the retail customer doesn't directly buy goods and services from NASDAQ and doesn't have an account with NASDAQ. It seems to me, why isn't that an issue of fact as to whether there, there is a kind of relationship that qualifies under the ordinary English definition, no technical fancy stuff about securities law, because I don't think there is a special securities law definition of customer. Why, why isn't that just an issue for a jury to decide? Do we treat this person as a customer within that meaning? Well, Citigroup itself, of course, was applying it in a situation where the whole point was the, the investor wasn't getting anything at all from City UK, from City New York, they were getting from City UK. And the point was, you've got nothing from City New York. You didn't have a relationship at all here. I'm not sure that's exactly true. I mean, there were people in New York who were working as part of the Citigroup empire and presumably Citigroup has some way of figuring out, and there may even have been some bonuses paid to the people in New York for the work they did on this transaction on behalf of Citigroup UK. So if you're going to say you can be an indirect customer, that might apply there too. Well, I think it's, there you're talking sort of a sister horizontal relationship between the entities. Here, it would be as if I went to City London or City UK and said, I can't deal with, you know, the EC. I'm not allowed to, I want to purchase something from the EC. I want to use the EC services. I'm hiring you as my broker. And when you purchase something, it's in my name. Remember when you purchase stock on the NASDAQ, when John Hacker gets stock through Joe's brokerage house, the title goes directly to John Hacker. It's not like Joe buys it and then turns around and resells it to me. The title is in the directly in the investor. And so you're the one utilizing the services. As the complaint here itself said, paragraph 235 said the class is complaining about what they were complaining about was the fact that they wanted to quote, utilize the NASDAQ stock market to purchase and sell shares of Facebook stock, but they didn't receive the trading services they expected and needed to receive. That's, they were ones seeking to utilize the service through brokers as their agents on their behalf, and they didn't get what they wanted. That's what the E&O policies are about. That's what they're supposed to cover is flaws in the professional services of the platform, the trading platform that NASDAQ provided. That's what those policies are all about. And they covered all of the losses here. A hundred percent of the losses are covered. You have two issues. Number one, you want to prevail as a matter of law and you have to convince us that there's no fact. And number two, you have to convince us that you, you're the one that should come out on the law, not your adversary. Doesn't the fact that the district court denied the 12B6 motion and had to take into account a lot of extraneous material to come out differently on summary judgment, isn't the biggest case against you, the district court's 12B6 decision? I think the answer is no, for the reasons Judge Rakoff explained in his summary judgment decision, which was at the duty to defend stage, first of all, it's a broader standard. You only look at the complaint and the policy and decide whether or not it states a claim that could be covered. And at that point, he didn't have before him three separate things that he later said in the summary judgment opinion might have actually made a difference to him. One was all the federal securities laws decisions that uniformly, uniformly treat retail investors as customers and never say the opposite. Why weren't those decisions in front of him on the 12B6? They're case law. For whatever reason, I understand for whatever reason that that wasn't, you know, brief lawyers come up with new arguments as a case developed. That argument was added and he relied on it. It doesn't make it erroneous for him to have relied on it because the lawyers didn't present it to him at an earlier stage of the proceeding. And that's the last question Judge Kogan asked. Did you call it to his attention? Not at the motion to dismiss stage. The lawyers representing him did not do it at that stage. They did later and there's no question of waiver. Nobody thinks it's like the summary judgment opinion is wrong because those opinions weren't cited in the duty to defend stage. Judge Rakoff was happy to get them and he said it changed my views, as often happens in the course of litigation. The other facts were the two statements from the exchange officers treating retail investors as their customers, the ones who utilize their services through brokers. That was new information that was provided. And the third thing was the computer crime policies, which Beasley now tries to rely on because the computer crime policies, unlike the DNO policy here, specifically say that you're only a customer if you have a written relationship, a written agreement with NASDAQ. That's what those policies say. And they say that because if they didn't, customer would be more broad as it is here in its ordinary meaning. An investor who wants to... Can I back up? You've emphasized several times that you are relying on the ordinary meaning of customer as somebody who purchases services and that that's true of retail investors vis-a-vis NASDAQ. So does that mean that this whole thing about specialized legal meaning is a red herring at the end of the day? It's just customer means what customer means in every possible context. It's an ordinary English word. It means someone who purchases services. And the question before the court is whether that definition applies unquestionably as a matter of law with no factual disputes to the relationship between a retail investor and NASDAQ. The way I would put it is either as a matter of law or as a matter of fact, there's just no dispute. There's no source of authority. Is this a technical legal term of art specialized meaning or is it just a dispute about the application as I think you started out your oral argument saying of the ordinary common language meaning of customer? I think that's basically right. We don't have to establish a specific specialized meaning here. What we're saying is that wherever you look in the law or in the factual record, everybody agrees that a retail investor can be is a customer. All Beasley ever says all of their evidence case law says is that members are also customers, which of course is true, but their customers so that they can represent their principles, purchase stock on behalf of the people who want to be using NASDAQ services, but can't do it directly. So they hire an agent. May I with the presiders indulgence? That's just one technical question that not related to the merits. Both sides have filed redacted briefs here. You and then the reply brief on the other side. I take it. The redaction is because the settlement with they quote the settlement agreement between NASDAQ and the class action plaintiffs, which is confidential. I believe that's right. But of course we know and it's in the public parts of the brief how much the what about the assignment to Beasley? And I think that's all that's quoted. So I'm having a little trouble understanding why we have to have big black blotches on the public record when I don't see it as anything secret. Maybe you don't want to answer that right now, but I'm wondering if the parties will at some point agree on just allowing the full briefs to be filed. And if not, let us know. I have absolutely no problem with conferring with counsel afterwards and figuring out like what the basis is. And if there is some, you know, particularly justifiable piece, we'll explain it to the court in some sort of submission. I'm happy to do that. So no further questions. I'll defer the balance of the time. No, no rebuttal. Right. Mr. Lorenzo representing Illinois National, which is the excess DNO carrier. Is that correct? Correct. Your honor. Good morning. So Illinois National joins in the arguments of ACE as clear in our brief. If the court is inclined to consider remanding the case, we want to raise an additional issue unique to Illinois National and that's standing. And here there was a bit of confusion at the complaint stage and the motion to dismiss decision about what the actual assignment was. Paragraph five of the complaint suggests to the court that NASDAQ has assigned all of its rights in the DNO tower to Beasley. However, when we actually received the assignment after the decision on the motion to dismiss, it was revealed that the assignment was actually up to a fixed limit, the amount of the payment that Beasley had made, which is expressly set out as $15 million. And what that means is, and it's not on appeal here, our policy is not triggered until ACE's $15 million primary policy is extinguished through payment. And thus by virtue of that $15 million limit, there is no article three case or controversy as it relates to my client, Illinois National. Now Beasley has an argument about somehow this being interrelated with some other policy that Illinois National has on the other side of the V somehow. Well, so our sister company, Charity Specialty Insurance, was the primary ENO carrier and paid out the full limit of its policy. But that doesn't impact standing as against Illinois National, a separate company that issued a separate policy on the DNO side. Is there any reason why we should, or even have to, resolve that issue on appeal? So if, in other words, if ACE wins on its argument, then this issue is moot, right? Because the judgment is confirmed, everybody's dismissed and everybody goes home. Correct, Your Honor. And if they turn out to be wrong and Beasley is right on that issue, the judgment was not addressed by the district court. That's correct. It was raised in our briefs, but the district court has a footnote in summary judgment decision indicating that it doesn't address the problem. So as long as we make clear to the district court that there can't be a trial against you until that issue is resolved, why would we want to address this at the appellate level in the first instance? Well, I think this court and the precedent is clear, strictly police's, it's standing and the . . . We can do it, but why would we want to? Certainly my client, if it's possible, and part of the argument is, we really shouldn't be dragged back to the district court because there isn't standing and there really is no dispute here. The burden is on Beasley to show facts under Lujan. They have to show specific facts at the summary judgment stage that they have standing. There's nothing in the record suggesting there's any exhaustion of the ACE policy. In fact, Judge Rakoff noted the complaint doesn't even allege that. And so here, all the facts necessary are before the court. There really is no reason to send it back down if the court is inclined to remand on the professional services issue. If the court doesn't have any further questions, I'm happy to . . . Thank you. Thank you. For you, everybody, three minutes for rebuttal. Yes. Thank you. I'll start with the INIC standing issue because that's probably freshest on everybody's mind. The issue is that $4.9 million was paid by ACE on the E&O tower on top of Beasley and they are contending that they get an offset and therefore only 10 plus million is available under their policy, which means that after 10 plus million, their policy would exhaust and the INIC policy would be up. From Beasley's perspective, it doesn't matter whether it's ACE that pays or INIC that pays, but that issue is right in the underlying proceeding, which is why, in my view, the correct answer is to send it back down, which I'll talk about in a minute, and then if ACE wants to concede that it is not entitled to a set-off, fine, we don't need INIC. But as it stands now, in the record, and the record is what matters, in the position that they are entitled to the $4.9 million settlement, which means that its policy will exhaust and INIC's policy will be up before 15 million. Going to the customer issue, back to that. My counterpart said that we always agree from a factual standpoint that under ordinary use, under ordinary use, that a retail investor is not a customer of NASDAQ. That's absolutely not true. The accommodation plan by NASDAQ could not be more clear. It says there is no contractual relationship or otherwise with the retail investors. The contract between ACE and NASDAQ in the crime policy had a definition of customer. That definition of customer required a contract between the two parties. The ordinary use definition adopted in the securities context, in the FINRA context, by Citigroup, Deutsche Bank, in all those cases, requires something very specific. Either a contract consistent with the crime policy, or buying directly goods or services from the purported entity to which you want to say you're a customer of. There is nothing. Would FINRA take a claim from a retail customer? And have they ever done so? Would FINRA take a claim from a retail investor? Yes. Against NASDAQ, NASDAQ is not a member. NASDAQ affiliates are members. So if you look at the FINRA rules, you'll actually see NASDAQ affiliated entities are members. And that's what defines the logic. So in the FINRA, in the securities context, customer means a contract between two. But under an insurance policy, it means something completely different. And that's why I started with the burden. The question isn't whether Ace's interpretation is reasonable. The question is whether or not Beasley's interpretation is a reasonable interpretation. And to answer your question, on the tension, if you look at Judge Rakoff's decision on the summary judgment, he concedes that there is a tension between the accommodation plan and how he ruled. And he just concluded that the evidence that Ace presented was more probative of his conclusion. Tension, probative. That's not something you get to do on summary judgment at the trial court level. And I'll leave with this last point. If you look at the Citigroup decision, 2014, that's when these policies are issued. Last page. It talks about how finance is done in today's world. It says it involves a number of technologies, a number of people. But just because it involves a number of people and a number of technologies, that does not mean that a customer relationship is necessarily entered into between them all. And that's the exact point. That's 2014, when the policy issued, when this happened. Not every situation with multiple parties in a financial transaction creates a customer relationship amongst everybody. So at a minimum, you would have to try. You would have to figure out whether or not there was a direct buy of goods and services. And there's nothing in the record to suggest that the members were somehow an agent and they had full scope and full authority. That's not in the record. Reason why it's not in the record? Because Ace argued specialized legal meaning, not ordinary use. They argued specialized legal meaning, which you could never get to on this record because the underwriter's declaration in the first place. Thank you, counsel. Thank you all. We'll reserve decision on this interesting case.